DOA: 02/09/2024

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| United States of America | CRIMINAL COMPLAINT |
|---|---|
| v. | CASE NUMBER: 24-6055MJ |
| Alfredo Macias, Daniel A. Galvan, and Jesus David Vega-Rivera | |

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

On or about the dates described in Attachment A in the County of Maricopa in the District of Arizona, the defendants violated 18 U.S.C § 371 and 18 U.S.C. §§ 922(o) and 924(a)(2), an offense described as follows:

**See Attachment A – Description of Counts**

I further state that I am a Special Agent from Bureau of Alcohol, Tobacco, Firearms, and Explosives and that this complaint is based on the following facts:

**See Attachment B – Statement of Probable Cause Incorporated by Reference Herein.**

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

AUTHORIZED BY: Jacqueline Schesnol, AUSA

SA Zachary Knolmayer
Name of Complainant

ZACHARY KNOLMAYER
Signature of Complainant

Sworn to ~~before me electronically~~  Telephonically and signed electronically.
February 11, 2024 @ 4:10pm            at    Phoenix, Arizona
Date                                         City and State

HONORABLE ALISON S. BACHUS
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

# ATTACHMENT A
# DESCRIPTION OF COUNTS
## COUNT 1
### Conspiracy

On or between January 31, 2024 and February 9, 2024, in the District of Arizona, Defendants ALFREDO MACIAS, DANIEL GALVAN, and JESUS DAVID VEGA-RIVERA did knowingly and intentionally combine, conspire, confederate, and agree together and with persons known and unknown, to commit offenses against the United States, that is: possession of a machinegun, in violation of Title 18, United States Code, Sections 922(o) and 924(a)(2).

### Purpose of the Conspiracy

The purpose of this conspiracy was to possess a machinegun.

### The Means and Methods of the Conspiracy

The means and methods employed by Defendants and their co-conspirators to carry out the conspiracy and effect its unlawful objects are as follows:

It was part of the conspiracy that Defendants and co-conspirators would possess a machinegun in the District of Arizona.

It was further part of the conspiracy that Defendants and co-conspirators would purchase a machinegun from other individuals.

It was further part of the conspiracy that Defendants and co-conspirators purchasing a machinegun would be compensated monetarily for their actions by other Defendants and co-conspirators.

### Overt Acts

In furtherance of the conspiracy, one or more of the co-conspirators committed, or caused to be committed, the overt acts described below:

Defendant Alfredo MACIAS (MACIAS) communicated with an individual, who was, unbeknownst to him, an undercover (UC) federal law enforcement agent.

MACIAS and Daniel GALVAN (GALVAN) communicated with the UC via phone

and text messages about the cost of machineguns.

On February 9, 2024, in the District of Arizona, MACIAS and GALVAN met with the UC, where the UC showed MACIAS and GALVAN a machinegun, and MACIAS and GALVAN confirmed they had the agreed-upon amount of money to purchase a machinegun.

On February 9, 2024, in the District of Arizona, Jesus David VEGA-RIVERA was the driver of a vehicle that met with MACIAS and GALVAN. Someone in the vehicle VEGA-RIVERA was driving gave a package to MACIAS. Immediately thereafter, MACIAS showed the UC the agreed upon amount of money for the machinegun.

MACIAS and GALVAN both handled a machinegun that the UC showed them and demonstrated it functioned as a fully automatic rifle.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2

### Possession of a Machinegun

On or about February 9, 2024, in the District of Arizona, Defendants ALFREDO MACIAS and DANIEL GALVAN did knowingly possess a machinegun.

In violation of Title 18, United States Code, Sections 922(o) and 924(a)(2).

## ATTACHMENT B

## STATEMENT OF PROBABLE CAUSE

I, Zachary Knolmayer, Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives, Phoenix, Arizona, being duly sworn, hereby depose and state:

## INTRODUCTION AND AGENT BACKGROUND

1. Your Affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and has been since January 2023. During the course of your Affiant's employment with ATF, your Affiant has received formal training in criminal investigations; interview and interrogation; drug trafficking investigations; drug identification; money laundering investigations; firearms trafficking investigations; firearms identification; investigations of other areas of criminal activity; search warrant procedures; confidential source management; undercover operations; and court preparation over the course of twenty-seven weeks between the Federal Law Enforcement Training Center and ATF National Academy in Brunswick, Georgia.

2. As a Special Agent with ATF, your Affiant has performed various tasks, which include, but are not limited to: functioning as a surveillance agent, thus observing and recording movements of persons committing criminal violations and those suspected of committing criminal violations; interviewing witnesses, confidential sources (CS), cooperating defendants (CD), and sources of information (SOI) relative to the illegal trafficking of contraband and firearms and the distribution of monies and assets derived from illegal acts; functioning as a case agent, entailing the supervision of specific investigations involving the trafficking of firearms and contraband and other criminal activities. Your Affiant has personally interviewed informants and persons involved in illegal activity. Your Affiant has consulted with other experienced investigators concerning the practices of criminals and the best methods of investigating them. In

1

preparing this Affidavit, your Affiant has conferred with other Special Agents and other Law Enforcement Officers, who share the conclusions stated herein.

3. The facts contained in this Affidavit are based on my personal observations and in part on information provided to your Affiant by other law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers; calls and/or text messages; information provided by confidential sources; information provided by undercover officers; information obtained from witnesses; and information learned through seizures of contraband. Your Affiant also relies on my own experience, training, and background in evaluating this information.

4. Based on the below facts, your Affiant submits there is probable cause that ALFREDO MACIAS (MACIAS), DANIEL A. GALVAN (GALVAN), and JESUS VEGA-RIVERA (VEGA-RIVERA) committed the crime of Conspiracy to Possess a Machinegun, in violation of Title 18, United States Code (U.S.C.) §§ 371, 922(o), and 924(a)(2); and MACIAS and GALVAN committed the crime of Possession of a Machinegun, in violation of 18 U.S.C. §§ 922(o) and 924(a)(2).

## **PROBABLE CAUSE**

5. In January of 2024, Special Agents of the ATF in, Phoenix, Arizona, initiated an investigation into the suspected illegal activities of a subject known only as "FREDO." Your Affiant now knows that "FREDO" is Alfredo MACIAS. MACIAS was suspected of coordinating and financing illegal firearms trafficking activities, specifically of procuring firearms in the Phoenix area and trafficking those firearms to Mexico.

6. On or about January 31, 2024, the cellular telephone utilized by an ATF Special Agent acting in an undercover capacity (hereinafter referred to as UC1) received a text message from a subject utilizing cellular telephone number (602) 846-9875. Law enforcement identified the user of telephone number (602) 846-9875 as Alfredo (Fredo) MACIAS. MACIAS received UC1's phone number from another individual, as further described below.

7.  From January 31, 2024 through February 9, 2024, UC1 and MACIAS had been intermittently in contact via phone calls and text messages. Examples of conversations between UC1 and MACIAS include:

A) On January 31, 2024, MACIAS texted UC1. During this text, MACIAS stated he had received UC1's phone number from another individual (that individual owed MACIAS money because that individual had purchased a firearm on behalf of MACIAS, but ATF seized the firearm before it could be transferred to MACIAS). During this text exchange, MACIAS inquired about what kind of "hardware" UC1 had. Your Affiant knows that "hardware" is a reference to firearms. MACIAS texted UC1 advising his associates have buyers for anything. MACIAS texted UC1, "No yeah bro I'm legit we all here for the same shit to make bread." Your Affiant knows that "bread" is slang for money. MACIAS advised UC1 that firearms such as belt-fed rifles or AK-style rifles in bulk could possibly satisfy any debts owed to his associates (in regards to the seized firearm as described above). MACIAS also advised UC1 via text, "Lmk bro that's what I'm looking for someone to do good biz with but on the low."

B) On February 1, 2024, MACIAS initiated text conversation by advising UC1 that his associates would accept a "mini me" (in reference to a belt-fed rifle) or cash to satisfy any debts. UC1 texted MACIAS that UC1 would send pics of rifles when s/he had a chance. After approximately seven hours passed, MACIAS asked UC1 for photos. UC1 then sent MACIAS a photo of three belt-fed FN M249S rifles. UC1 and MACIAS texted about fully automatic firearms (machineguns), and UC1 advised MACIAS they could meet and see the firearms in person.

C) On February 2, 2024, MACIAS texted UC1, "Lmk." Your Affiant knows that "Lmk" is slang for "let me know." UC1 did not respond to the text.

D) On February 3, 2024, MACIAS texted UC1, "Don't have the bread?" Your Affiant knows that "bread" is slang for money. UC1 had discussed the cost of

3

belt-fed rifles with MACIAS. From the communications, it was clear that MACIAS had knowledge of trafficking and straw purchasing of firearms. For example, MACIAS texted to UC1, "We sold the mini for 28 they gave us 19k up front they are only asking for half which 9.5 g I'll see if these foos want to wait that week because they were ready to pull up to that foos crib." Your Affiant knows that "foos" is a reference to the individual who had a firearm seized by ATF, as described above. The aforementioned text refers to MACIAS and his associates selling a straw purchased belt-fed rifle for $28,000.00. MACIAS indicated that he was paid $19,000.00 to coordinate the straw purchase of a belt-fed rifle. Because the last rifle which MACIAS had coordinated the purchase was seized by ATF, the suppliers of cash were attempting to recoup half their lost money, which was $9,500.00 (as described above).

E) On February 5, 2024, MACIAS initiated a telephonic conversation with UC1. MACIAS asked UC1 what UC1 could get MACIAS and his associates. MACIAS advised that his associates "deal more with guns, that's what they are after right now." UC1 then advised that he has firearms, including access to fully automatic rifles (machineguns). MACIAS then advised, "Even after the situation, I don't mind making business - you know – we're all here for the same thing." Your Affiant believes "the situation" was in reference to the firearm that was seized by ATF, and "we're all here for the same thing" is in reference to making money by trafficking firearms. UC1 invited MACIAS and his associates to a meeting where they could see what firearms were available for sale. MACIAS continued to stress that his associates would like UC1 to have firearms available for purchase at the time of the meeting to make the meeting worth their time. UC1 and MACIAS negotiated the debt of $9,500.00 owed towards the purchase of a fully automatic rifle (machinegun). MACIAS asked UC1 hypothetically what the price of "one" would be right now. UC1

advised the price of the rifle would be approximately $16,000.00 and that the rifles are "full auto." Your Affiant knows that "full auto" means a fully automatic rifle, also known as a machinegun. UC1 stated that s/he knows these types of rifles (machine guns) sell for $50,000.00 to $60,000.00 over the border (in reference to Mexico). MACIAS agreed with UC1 and stated, "You're completely right." MACIAS also inquired about purchasing AK rifles as well because his associates move bulk AKs. UC1 told MACIAS that UC1 would have to check, but UC1's associate only deals with larger firearms. MACIAS stated his associates are all for coming to check out what UC1 had in stock. UC1 told MACIAS to bring his associates to a meeting as well.

F) On February 6, 2024, UC1 asked MACIAS if he and his associates would meet on Friday (in reference to February 9, 2024) to potentially purchase firearms. MACIAS inquired about meeting sooner than Friday. UC1 texted MACIAS, "We got a couple full auto minis" and "17k each." Your Affiant knows that "full auto minis" are fully automatic, belt-fed rifles (machineguns), and "17k each" is the price for each machine gun. MACIAS responded, "Do u have any in hand right now? I have a guy that wants 2 and is cash ready." UC1 then maintained a meeting date of Friday with MACIAS. MACIAS asked, "17k is the best you can do?" UC1 responded, "Bro theyre full auto." Your Affiant knows this is a reference to fully automatic rifles (also known as machineguns).

G) On February 7, 2024, MACIAS texted UC1 and negotiated a price of $16,000.00 for the full auto rifles by texting, "I was thinking 16k I have that buyer that wants to buy 2 and the 3rd one for us." UC1 confirmed with MACIAS that MACIAS wanted three fully automatic rifles (three machineguns) and was willing to meet on Friday, February 9, 2024 at 1:00 P.M. to complete the deal.

H) On February 8, 2024, MACIAS asked for pics of the fully automatic rifles (machineguns). MACIAS texted UC1, "Send some they are asking for some." MACIAS then texted "4805013837" and "Send it to this number." Using law

5

enforcement databases, this phone number came back to Daniel A. GALVAN (GALVAN). GALVAN is a known associate of MACIAS. UC1 texted the same photo previously mentioned to (480) 501-3837. GALVAN responded to the photo with "Bet." Your Affiant knows that "Bet" means okay, as in "you bet." GALVAN advised UC1 he received the photo. MACIAS then texted UC1, "Bet and they asked if it's possible to go for one for them right now." UC1 then texted MACIAS to send a photo of the money that would be used to purchase the machineguns. MACIAS sent a photo of bulk U.S. currency bound with rubber bands. UC1 questioned MACIAS regarding whether or not MACIAS's photo contained $48,000.00, and MACIAS advised it contained approximately $30,000.00. MACIAS then advised that MACIAS thought only two of the rifles were being paid for and the third rifle was going to cover the debt owed from the rifle ATF had previously seized. UC1 agreed to the deal. MACIAS and GALVAN, on each of their separate phone numbers, sent UC1 a short video of the bulk cash currency sitting on what appeared to be an open Glock pistol case. UC1 then texted both MACIAS and GALVAN on their separate phone numbers advising the deal would proceed. UC1 advised MACIAS that UC1 would contact him in the morning.

I) On February 9, 2024, MACIAS texted UC1, "What's up." UC1 negotiated a location to meet with MACIAS before they would then travel to a controlled location to conduct the full auto firearms transaction (where law enforcement could safely make arrests).

8. At approximately 1:45 P.M., UC1 and UC2 met with GALVAN and MACIAS in the Phoenix area. GALVAN and MACIAS arrived in a white Corvette; GALVAN was the driver and MACIAS was in the front passenger seat. MACIAS advised UC1 that they did not have the purchase cash in their vehicle but that the cash was in a nearby vehicle. MACIAS identified a gray Jeep, across the street from their current location (the original meeting location), as the cash supplier's vehicle. MACIAS advised

there were multiple people in the Jeep. UCs advised MACIAS and GALVAN they would need to have cash to move on to the secondary location (the controlled location) to complete the deal. ATF Special Agents were observing this transaction, and the agents could see the gray Jeep. UC1 exited the undercover vehicle (UCV) and opened the trunk of the UCV. MACIAS exited the passenger seat of the GALVAN's white Corvette. UC2 saw the grip of a pistol in the front, right pocket of MACIAS's black pants. UC1 showed MACIAS a fully automatic rifle (machinegun) in the trunk of the UCV. Because MACIAS and GALVAN did not have the cash to purchase the firearms, UC1 and UC2 got back in UCV and left the original location.

9. At approximately 2:34 P.M., UC1 and UC2 returned to the original meeting location in the UCV. At approximately 2:40 P.M., surveillance agents observed the white Corvette also return to the original meeting location. MACIAS and GALVAN exited the white Corvette. Immediately thereafter, the gray Jeep returned to the original location, as well. Surveillance agents observed both MACIAS and GALVAN at the driver's side window of the Jeep. Your Affiant knows that the driver of the gray Jeep was Jesus David VEGA-RIVERA (as described in more detail below).

10. Surveillance agents observed an exchange of a package from the Jeep to MACIAS. MACIAS and GALVAN then got back into the Corvette and immediately drove across a parking lot towards the UCV. MACIAS then showed the UCs a rubber-band-bound amount of bulk cash currency. UCs advised MACIAS and GALVAN to follow the UCV to the secondary location (the controlled location). UCs also advised that the Jeep, and its occupants, could also follow them to the secondary location (the controlled location).

11. At approximately 2:14 P.M., UC1 spoke with MACIAS telephonically. MACIAS explained he would initially like to pay for one rifle and take another rifle as the debt owed. UC1 agreed to MACIAS's term of the deal.

12. At approximately 2:48 P.M., UCs, MACIAS and GALVAN entered the controlled location. The Jeep parked outside the controlled location. While at the

7

controlled location, MACIAS exited the passenger side of the Corvette and handed the bulk cash to UC1. MACIAS engaged UCs in conversation about prices of firearms such as the .50 caliber rifle, which was inside the controlled location. MACIAS asked UCs where UCs sell those .50 caliber rifles. MACIAS then answered his own question and stated, "Mexico, they're all going to Mexico." This statement refers to large caliber and belt-fed rifles being trafficked to Mexico. UC1 then pointed to the three fully automatic rifles (machineguns) and asked MACIAS if they were also going to Mexico. MACIAS confirmed that all the rifles would be going to Mexico upon their purchase. UC1 handed the bulk cash currency to UC2. MACIAS and GALVAN with UC1 then gathered around one of the full auto rifles. UC1 demonstrated a field-test for fully automatic function of a firearm to MACIAS and GALVAN. UC2 also advised MACIAS and GALVAN that fully automatic rifles such as those were "illegal" and "if you get caught with this, you are doing time." UC2 asked MACIAS if he understood what those rifles were, and MACIAS said, "Yeah." During UC1's field-test of the fully automatic rifle, GALVAN stated, "It never reset (in reference to the trigger not resetting after cycling the action of the rifle, which indicates fully automatic function of the rifle). UC1 asked GALVAN, "You know what that means right?" GALVAN responded, "You pull that bitch, and it goes blrrrrrrp." UC1 then said, "That's full auto." MACIAS then handed UC2 more cash. GALVAN then went back to the Corvette and retrieved more cash from the vehicle. UC1 then demonstrated the field-test of the fully automatic (machinegun) rifle to MACIAS again, and UC1 handed the machinegun to MACIAS. MACIAS handled the machine gun as GALVAN entered the room again with a bag containing more bulk cash. GALVAN then counted out money from his bag. At this time, MACIAS received a very brief phone call and hung up. UC2 then spoke with MACIAS and GALVAN regarding the purchase cash. MACIAS told UC2 he handed him $14,000.00 and then handed UC2 another $1,000.00. GALVAN then handed UC2 more cash to equal the agreed upon $16,000.00 purchase price for the first machinegun. GALVAN then walked over to the same rifle MACIAS put down after it was handed to MACIAS by UC1 and, GALVAN picked up the machine gun briefly and put it

back down. MACIAS and GALVAN then both took photos of all the firearms (machineguns and other rifles at the controlled location).

13. MACIAS and GALVAN were then taken into custody by ATF and Homeland Security Investigation (HSI) Special Agents.

14. The occupants of the gray Jeep were also taken into custody at 3:00 P.M., on Friday, February 9, 2024, by ATF and HSI Special Agents outside of the controlled location. The occupants included Jesus David VEGA-RIVERA (VEGA-RIVERA) and two others. VEGA-RIVERA was confirmed as the driver of the gray Jeep.

15. When taken into custody, MACIAS was found to possess an FN 5.7 handgun in his pants pocket. The handgun was loaded with a magazine and had one round in the chamber.

16. The rifle purchased and possessed by MACIAS and GALVAN was determined to be a fully automatic rifle (machinegun) by ATF Special Agents.

17. MACIAS, GALVAN, and VEGA-RIVERA were transported to a law enforcement facility for further processing and interviewing.

18. ATF Special Agents advised MACIAS of his *Miranda* warnings. MACIAS waived his rights and agreed to speak with the ATF Special Agents. During the interview, MACIAS advised he was provided the FN 5.7 pistol from one of the occupants of the gray Jeep prior to meeting with UC1 and UC2 that day. MACIAS admitted that he was struggling financially and dealing firearms was a way to make quick money. MACIAS stated he was handed the money from the driver of the Jeep, but he could not specify which individual it was. MACIAS stated he communicated earlier with all of the individuals in the Jeep in the group chat. MACIAS claimed he was conducting this firearm transaction as a favor to the occupants of the Jeep. MACIAS stated he was going to make $2,000 for this transaction. Your Affiant knows that MACIAS was convicted in the Maricopa County Superior Court of Endangerment, a class 6 felony, on or about September 26, 2022, and sentenced to probation. During his custodial interview, MACIAS admitted to being on probation.

9

19. ATF Special Agents advised GALVAN of his *Miranda* warnings. GALVAN waived his rights and agreed to speak with the ATF Special Agents. During the interview, GALVAN admitted that he sells firearms. Your Affiant knows that GALVAN does not have a license to sell firearms. GALVAN admitted to obtaining firearms from others and paying others a profit per firearm. GALVAN stated that in October 2023, he started a relationship with VEGA-RIVERA and another individual from the Jeep. This relationship was for the purpose of GALVAN obtaining firearms, selling those firearms to VEGA-RIVERA and the other person, and that he (GALVAN) understood those firearms were going to Mexico. GALVAN admitted to previously obtaining firearms for VEGA-RIVERA on multiple previous occasions.

20. ATF Special Agents advised VEGA-RIVERA of his *Miranda* warnings. VEGA-RIVERA waived his rights and agreed to speak with the ATF Special Agents. VEGA-RIVERA stated he is aware he is illegally present in the United States and does not have legal status to be present in the United States. Your Affiant confirmed with HSI that VEGA-RIVERA is not lawfully in the United. States. VEGA-RIVERA further stated he is aware it is illegal for him to possess or purchase firearms. VEGA-RIVERA was the driver of the Jeep at all times. The Arizona registration of the Jeep is in VEGA-RIVERA's name. The Jeep was present and in view of all meetings with UCs on February 9, 2024. VEGA-RIVERA confessed he has brokered multiple straw purchasing transactions to include Glock pistols and AK-style rifles in the past. During the search of the Jeep, there were two AK rifles recovered as well as one Glock pistol. One of the AK rifles was loaded with a round in the chamber of the firearm.

21. Cellular telephones were seized from MACIAS, GALVAN, VEGA-RIVERA, and others, and search warrants will be forthcoming.

## CONCLUSION

22. For these reasons, your Affiant submits that there is probable cause to believe Alfredo MACIAS, Daniel GALVAN, and Jesus David VEGA-RIVERA committed the

crime of Conspiracy to Possess a Machinegun, in violation of Title 18, United States Code (U.S.C.) §§ 371, 922(o), 924(a)(2); and Alfredo MACIAS and Daniel GALVAN committed the crime of Possession of a Machinegun, in violation of Title 18, United States Code (U.S.C.) §§ 922(o) 924(a)(2).

17.    I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

ZACHARY KNOLMAYER
Digitally signed by ZACHARY KNOLMAYER
Date: 2024.02.11 15:15:05 -07'

ZACHARY KNOLMAYER
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to and subscribed telephonically this 11th day of February 2024.

HONORABLE   ALISON   S. BACHUS
United States Magistrate Judge